IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CONTINA GRAHAM,
        Plaintiff,

-vs-                                                    Case No. A-12-CA-977-SS

BLUEBONNET TRAILS COMMUNITY
SERVICES,
        Defendant.

## ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Defendant's Motion for Summary Judgment [#38][1]; Defendant's Amended Motion for Summary Judgment [#46], Plaintiff's Response [#50], and Defendant's Reply [#54]; Defendant's Motion to Strike Experts [#49], Plaintiff's Response [#55], and Defendant's Reply [#56]; and Defendant's Motion to Strike Exhibits [#51]. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

This is a pro se lawsuit based on alleged racial discrimination. Defendant Bluebonnet Trails Community Services (Bluebonnet) is a community center which provides mental health and mental retardation services for an eight county service area in Central Texas. Certain services are provided to clients by Bluebonnet through service providers under contract with Bluebonnet. Plaintiff Contina Graham was, from 2005 to September 2008, an employee of Bluebonnet providing services to

---

[1] This motion is DISMISSED AS MOOT in light of Defendant's Amended Motion for Summary Judgment [#46].

persons in need of assistance. In January 2007, Graham formed a business called Sharing the Love Health Care, Inc. (Sharing the Love), and in August 2008, she applied to become a contractor of Bluebonnet. *See* Def.'s Am. Mot. Summ. J. [#46-1], Ex. 25 (including both Graham's application to become a contractor and, attached to this application, Sharing the Love's Certificate of Filing from the Secretary of State of Texas, dated January 10, 2007, indicating Graham filed a Certificate of Formation for Sharing the Love).

In September 2008, Graham and Sharing the Love entered into a contract with Bluebonnet to provide respite, supported home living/community support, and supported employment/employment assistance services. *See id.*, Ex. 27. The original contract was amended on a couple of occasions, and Sharing the Love's newest contract was to be for the term beginning September 1, 2011, and ending August 31, 2013. *See id.*, Ex. 26. These contracts bear the signature of Graham as CEO of Sharing the Love.

Beginning in 2009, Graham was notified of issues relating to performance under her contract with Bluebonnet including such issues as Graham's use of Bluebonnet's facility to conduct Sharing the Love's business. *See id.*, Ex. 4. The record also shows a number of other correspondences between various staff members of Bluebonnet and Graham relating to Graham's, Sharing the Love's, and the Sharing the Love's subcontractors' failure to prepare notes and bills properly or in a timely manner, along with other violations of contract requirements. *See id.*, Exs. 4–18, 20–21. A summary of the problems Bluebonnet experienced with Graham and Sharing the Love's work is as follows:

   (1)   Billing for services which were not supported by the service record or were unauthorized. *See id.*, Exs. 11–12, 20;

(2) Failure to provide trained backup staff in her absence, having a constant flow of her subcontractors conducting business with her while she was supposed to be working with a challenging client. *See id.*, Exs. 4–5;

(3) Failure to provide complete information regarding an additional site at which respite services were being provided and an additional person who was on the lease for this additional site. *See id.*, Exs. 6–7, 15, 17–18;

(4) Billing for services after authorization expired. *See id.*, Exs. 8–10, 16; and

(5) Repeatedly not turning notes in on time, turning in notes with errors, and failing to review subcontractor notes for accuracy despite training and notice relating to the contract requirements and deadlines. *See id.*, Ex. 21.

These problems with Graham caused difficulties for Bluebonnet's staff who had to process Graham's errors and correct them. *See id.*, Ex. 21. Graham was denied payment for some of the services which Bluebonnet determined were not properly billed.

While Bluebonnet became increasingly dissatisfied with Graham's work, Graham was also not happy with Bluebonnet's inspection of her apartment where services were being provided and the denial of payments. Indeed, Graham filed a complaint with the Equal Employment Opportunity Commission (EEOC) on June 21, 2012. *See* Supplement of Record [##5-3, 5-4], Exs. 3–4 (EEOC Charge), at 1. Graham claimed Bluebonnet, among other actions, decreased her pay, denied her pay, and unfairly inspected her apartment as part of a pattern of racial discrimination and retaliation. *See id.* On July 26, 2012, the Texas Work Force Commission (TWC) issued a Dismissal and Notice of Right to File a Civil Action in response to Graham's complaint. *See* Def.'s Am. Mot. Summ. J. [#46-1], Ex. 5 (TWC Decision). The TWC denied Graham's complaint because it found "[t]here is no employer/employee relationship. The evidence reveals you are an independent contractor." *Id.*

The problems between Bluebonnet and Graham persisted, and eventually Bluebonnet terminated the contract with Sharing the Love on September 4, 2012, for "continuously failing to meet the criteria for the provision of services." *See id.*, Ex. 22. Graham exercised her right to an appeal of the nonpayment of some of her services, and Bluebonnet denied this appeal on September 18, 2012, citing reasons such as: "poor documentation, submitting paperwork past the required timeframe, providing an unauthorized service, service time overlap, or inconsistency in dates and times." *See id.*, Ex. 23.

Graham filed this lawsuit in state court on September 24, 2012, and it was removed to this Court on October 22, 2012.[2] After the Court dismissed Graham's Original Petition for failure to state a claim, Graham filed an Amended Complaint in which she brought claims for: (1) racial discrimination and retaliation under 42 U.S.C. §§ 1981 and 2000e; (2) interference with contract; and (3) breach of contract. *See* Am. Compl. [#12]. Subsequently, the Court dismissed the breach of contract and interference with contract claims as well as the retaliation claims. *See* Order of Mar. 13, 2013 [#25]. Accordingly, the only remaining claims were and are: (1) discrimination under 42 U.S.C. § 2000e; and (2) discrimination under 42 U.S.C. § 1981. To the extent Graham attempts to

---

[2] This lawsuit is not this Court's first encounter with Graham. First, in 2001, Graham filed a pro se lawsuit against a shopping mall and a police officer based on an encounter Graham and her husband had with the officer while shopping. *See Graham v. Highland Mall Joint*, No. 1:01-cv-0305-SHC (W.D. Tex. Dec. 8, 2003). She filed claims for: (1) "impairment of property rights by racial discrimination pursuant to 42 U.S.C. § 1982;" (2) "impairment of constitutional rights under color of state law pursuant to 42 U.S.C. § 1983;" (3) assault; and (4) slander. After the claims against the shopping mall were dismissed for failure to state a claim, Graham took her case against the officer to a jury where she lost on every question. Judgment was entered in favor of the officer and affirmed by the Fifth Circuit on appeal. Second, in 2006, Graham filed a pro se lawsuit against an assisted care facility after this facility fired Graham as an employee. *See Graham v. The Court at Round Rock*, No. 1:06-cv-00386-RP (W.D. Tex. Oct. 15, 2008). She filed claims for racial discrimination and retaliation in employment under 42 U.S.C. §§ 1981 & 2000e, and later retained an attorney. The Court eventually adopted the Magistrate Judge's Report and Recommendation denying the defendant's motion for summary judgment, and approximately a year later, after a series of continuances, the Court dismissed the case after the parties notified the Court they had reached a settlement.

argue or re-urge any other claim in her filings, the Court rejects such an attempt, and focuses exclusively on the two remaining, live claims.

Bluebonnet filed a motion for summary judgment on February 4, 2014, and then an amended motion for summary judgment on February 18, 2014. Graham filed a response, and Bluebonnet filed a reply.

## Analysis

### I.     Legal Standard—Summary Judgment

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere

conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *Id.* The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322–23.

## II. Application

### A. Discrimination Claim Pursuant to 42 U.S.C. § 2000e

#### 1. Graham is a Contractor

Title VII makes it unlawful to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In order for a defendant to be subject to liability under Title VII, there must be an employment relationship between the plaintiff and the defendant. *See Deal v. State Farm Cnty. Mut. Ins. Co.*, 5 F.3d 117, 118 n.2 (5th Cir. 1993)

(citing *Fields v. Hallsville Indep. Sch. Dist.*, 906 F.2d 1017, 1019 (5th Cir. 1990)).The Fifth Circuit applies a "hybrid economic realities/common law control test" to determine if an employment relationship exists between a Title VII plaintiff and a defendant. *Deal*, 5 F.3d at 119 (citing *Fields*, 906 F.2d at 1019 (5th Cir.1990)). The Fifth Circuit has held that "the most important factor" in determining whether an employer–employee relationship exists under Title VII is "the 'extent of the employer's right to control the means and manner of the worker's performance . . . .'" *Bloom v. Bexar Cnty., Tex.*, 130 F.3d 722, 726 (5th Cir. 1997) (quoting *Mares v. Marsh*, 777 F.2d 1066, 1067 (5th Cir. 1985) (internal quotation omitted)). The control component considers whether the alleged employer has the right to hire and fire the employee, the right to supervise the employee, and the right to set his or her work schedule. *See Deal*, 5 F.3d at 119 (citation omitted). Additionally, a court looking to the "economic realities" of the relationship will "determine whether the alleged employer paid the employee's salary, provided benefits, and set the terms of the employment relationship." *Id.* (citation omitted).

Bluebonnet contends Graham was an independent contractor and therefore Bluebonnet is not subject to Title VII liability in a lawsuit brought by Graham. Graham argues, while she may have technically been a contractor, she was "misclassified" because she was, in fact, treated just like employee.

As an initial matter, the summary judgment evidence is clear: officially, Graham was a contractor. Prior to September 2008, she was an employee, but she formed the company, Sharing the Love, with the precise purpose of becoming a contractor per the advice of Bluebonnet's Director, Jim Clark. She filed an application to become a contractor for Bluebonnet. From September 2008 until the termination of the parties' relationship in September 2012, Graham, as CEO of Sharing the

Love, had a contractual agreement with Bluebonnet. Graham has repeatedly represented herself as a contractor until the filing of this lawsuit where she for the first time asserts she was actually treated like an employee. For instance, in her EEOC Charge, filed in June 2012, she describes her "Current Position" as "Contractor." EEOC Charge. In her letter accompanying the charge, she refers to herself as a contractor. For instance, she writes: "In September of 2008, I formed my own company and started contracting with Bluebonnet Trails providing services through my company, Sharing the Love Health Care Inc." *Id.* She describes herself numerous times as "the only contractor" who was subjected to various forms of mistreatment. *Id.* She mentions the subcontractors she hired and paid. *Id.* In sum, Graham knew she was a contractor, acted as a contractor, and represented herself as a contractor. Indeed, her EEOC Charge was denied because the TWC found "[t]here is no employer/employee relationship. The evidence reveals you are an independent contractor." TWC Decision.

After clearly self-identifying as a contractor in her EEOC complaint with no suggestion she was an employee, Graham changes her tune in her Amended Complaint when she asserts:

> In 2008 Jim Clark . . . who intentionally discriminated and threatened to fire [Graham], emailed [Graham] a Contract and told [Graham] to become an Independent Contractor, [Graham] formed Sharing the Love Health Care, Inc. Even though [Graham] was considered an Independent Contractor. [Graham] still performed the same duties as an employee. However [Graham] was denied access to benefits and protections to which [Graham] was entitled to before under the Federal and State Law as an employee. [Graham] was required to work at the Bluebonnet Trails Facility, [Graham] drove the [Bluebonnet] vehicle. [Bluebonnet] controlled every thing [Graham] did and how [Graham] performed the duties from 8a-5pm Monday-Friday. [Bluebonnet] controlled [Graham's] method of training and payment. [Bluebonnet] used [Graham] services to best fit [Bluebonnet's] needs. [Graham] worked as an employee and a Contractor. At the end of the year [Graham] received a W-2 and a 1099. [Graham] was suppose to be an Independent Contractor however [Graham] was treated like an employee. [Graham] was the only contractor treated this way. Jim Clark [Bluebonnet] manipulated [Graham] from being an

> employee to become an Independent Contractor. Only to limit, misclassify, and deprive Plaintiff of her fringe benefits (sick day, paid vacation, medical insurance, FMLA benefits, 401 (k) contributions, etc.) and overtime pay and denied protections to which [Graham] was entitled under the Federal and State Law as an employee while discriminating against [Graham] and later terminating [Graham] because of race and in retaliation to [Graham's] inquiries about disparate racial treatment.

Am. Compl. [#12], at 2.

Not only does Graham not provide any evidence to support these allegations, the summary judgment evidence contradicts these assertions. First, Graham has no evidence of Jim Clark's emails, alleged intentional discrimination, or threats to fire her. In her deposition, she said she had lost access to her email account and therefore admitted she had no evidence of any emails from Clark, or of any claims she made from 2005 to 2008 about Clark's racial discrimination against her. *See* Def.'s Mot. Summ. J. [#46-3], at 70:1–71:3. Moreover, Graham indicated in her deposition she followed Jim Clark's advice to form a company and become a contractor because it was a "good idea," not because of some threat or coercion on the part of Clark. *See id.* at 131:5–25. Indeed, Graham followed Clark's advice in forming Sharing the Love Health Care, Inc. sometime in 2007 or 2008, and then in 2012 again followed his advice to create a d/b/a of Sharing the Love Health Care, Inc., called Sharing the Love Community Support. *See id.* at 130:1–21. She indicated she took both of these actions in order to be able to grow an independent business, market directly to consumers, and move beyond just working for Bluebonnet. *See id.* at 130:1–131:25. In other words, the record indicates Graham made the decision to move from an employee to an independent contractor in order to develop a business and make more money, not due to some coercive attempt by Bluebonnet to deprive her of employee benefits based on her race.

In addition, Graham's claims that Bluebonnet controlled her work because she was required to work at the Bluebonnet Facility matter little when she also admitted she performed at least some of her services under the contract with Bluebonnet out of her home, out of another apartment she rented, and out of the residences of the clients. *See id.*, 103:17–105:7, 108:10–20. While Graham was apparently required to work certain hours at Bluebonnet's facility, this restriction was specified in the contract she signed and applied only to one particularly difficult client. *See* EEOC Charge. Graham agreed to provide services to this client when all the other contractors would not. *Id.* There is no evidence Graham drove the Bluebonnet vehicle, and there is no evidence Bluebonnet controlled everything Graham did from 8 a.m. to 5 p.m. There is evidence from Graham's own statement, however, that she hired subcontractors and conducted services from places other than Bluebonnet's facility, including her own residence and apartment.

In sum, it is clear Graham was a contractor, not an employee. In fact, Graham concedes as much, but merely argues (for the first time in this lawsuit) she was treated as an employee due to Bluebonnet's control over her work. The summary judgment evidence indicates, however, Graham had a great deal of control as CEO of Sharing the Love. Bluebonnet could not fire Graham from her CEO position or control Graham's treatment of her own subcontractors. While there were contractual parameters on the relationship between Graham and Bluebonnet, there was not the sort of control which would lead to a finding Graham was an employee of Bluebonnet. Indeed, Graham specifically decided to transition from her position as an employee, and formed a company so she could be an independent contractor. She did so in order to develop her own business and increase her pay.

Because Graham was an independent contractor, she cannot bring a claim against Bluebonnet under 42 U.S.C. § 2000e, and therefore Bluebonnet is entitled to judgment as a matter of law on Graham's discrimination claims made pursuant to this statute.

2.     **Alternatively, Graham has Failed to Exhaust Administrative Remedies**

Before an individual can pursue a Title VII claim in federal court, she must first exhaust her available administrative remedies. *See Taylor v. Books a Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002). Exhaustion occurs when an individual files a timely complaint with the EEOC, her claim is dismissed by that agency, and the agency informs her of her right to sue in federal court. 42 U.S.C. § 2000e–5(f)(1). The scope of the exhaustion requirement has been defined with two competing Title VII policies in mind. "On the one hand, because 'the provisions of Title VII were not designed for the sophisticated,' and because most complaints are initiated pro se, the scope of an EEOC complaint should be construed liberally." *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006) (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 463 (5th Cir. 1970)). At the same time, "a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims." *Id.* (citing *Sanchez*, 431 F.2d at 466). Balancing these policies, courts "interpret[] what is properly embraced in review of a Title–VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which 'can reasonably be expected to grow out of the charge of discrimination.'" *Id.* (quoting *Sanchez*, 431 F.2d at 466).

In the instant case, Graham filed her EEOC complaint on June 21, 2012, and she complains of discrimination and retaliation occurring roughly from March to May of 2012. The alleged discrimination took the form of reduced pay rates and assignments as well as an inspection of one

of Sharing the Love's service sites. On July 26, 2012, the TWC dismissed Graham's claims because it concluded she was a contractor, and the EEOC adopted the TWC's findings on August 22, 2012. It was not until September 4, 2012, that Bluebonnet terminated the contract with Sharing the Love, and Graham filed her lawsuit in state court on September 24, 2012. In her Amended Complaint, Graham asserts discrimination and retaliation based on generally some of the same conduct which formed the basis of her EEOC complaint, but it is clear her allegations of discrimination are mostly centered on the termination of the contract. Her EEOC complaint did not contain any allegations concerning the termination of the contract—indeed it could not since the EEOC Charge of June 2012 pre-dated the termination of the contract in September 2012. For this same reason, even with a liberal construction the scope of Graham's EEOC complaint does not encompass any allegations of discrimination premised on the termination of the contract because these allegations could not reasonably have been expected to grow out of Graham's EEOC Charge filed in June 2012. Graham never gave the EEOC an opportunity to consider the allegation of racial discrimination based on the termination of the contract and resolve it non-judicially.

Therefore, the Court finds, alternatively, Graham has failed to exhaust her administrative remedies, and to the extent her claims of discrimination are premised on the termination of the contract, Bluebonnet is entitled to judgment as a matter of law.

**B.     Discrimination Claim Pursuant to 42 U.S.C. § 1981**

Section 1981 provides "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . to the full benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizen . . . ." 42 U.S.C. § 1981(a). Section 1981, though, "[does] not provide a separate cause of action against

local government entities." *Oden v. Oktibbeha Cty., Miss.*, 246 F.3d 458, 462 (5th Cir. 2001) (citing *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989)). The Supreme Court in *Jett* "concluded that plaintiffs must assert a cause of action against state actors under § 1983 to remedy violations of civil rights under § 1981." *Id.* (citing *Jett*, 491 U.S. at 731).

In this case, Bluebonnet is a "community center" subject to regulation under the Texas Health & Safety Code, Chapter 534, and this designation is reflected in the contracts Graham and Bluebonnet signed. *See* Def.'s Am. Mot. Summ. J. [#46-1], Exs. 26–27. Texas Health & Safety Code § 534.001(c)(1) states that a "community center is: (1) an agency of the State, a governmental unit, and unit of local government, as defined and specified in Chapters 101 and 102, Civil Practices and Remedies Code." Therefore, because of this status, Graham must assert a cause of action under § 1983 to remedy any violation of her rights under § 1981, but she has not done so. Accordingly, Bluebonnet is entitled to judgment on Graham's § 1981 discrimination claim.

## C. Alternatively, Bluebonnet Prevails on Summary Judgment Under the *McDonnell–Douglas* Burden-Shifting Framework

Even assuming Bluebonnet was not entitled to judgment on the Title VII and § 1981 discrimination claims for the reasons stated above, Bluebonnet would still prevail at summary judgment under the traditional race discrimination analysis.

Claims brought pursuant to Title VII and § 1981 should both be analyzed under the "Title VII rubric of analysis" because "claims of intentional discrimination brought under Title VII and 42 U.S.C. § 1981 require the same proof to establish liability." *Byers v. Dall. Morning News, Inc.*, 209 F.3d 419, 422 n.1 (5th Cir. 2000) (citing *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996); *Anderson v. Douglas & Lomason Co. Inc.*, 26 F.3d 1277, 1284 n.7 (5th Cir. 1994)).

To survive a motion for summary judgment on a claim of racial discrimination under the "Title VII rubric of analysis," a plaintiff must first establish a *prima facie* case by a preponderance of the evidence. *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). A *prima facie* case of discrimination may be established through evidence demonstrating the plaintiff: (1) belongs to a protected class; (2) was qualified for the position; (3) suffered an adverse action; and (4) either was replaced by someone outside the protected class or was treated less favorably than other similarly situated persons outside the protected class. *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Okoye v. Univ. of Tex. Hous. Health Sci. Ctr.*, 245 F.3d 507, 512–13 (5th Cir. 2001). In the discrimination context, "'[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'" *McCoy*, 492 F.3d at 559 (quoting *Green v. Adm'rs of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002)). Once a *prima facie* case of discrimination is established, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Bryan v. McKinsey & Co., Inc.*, 375 F.3d 358, 360 (5th Cir. 2004). If the defendant meets this burden, the plaintiff must then offer sufficient evidence to raise a genuine issue of material fact as to whether the defendant's reasons are either: (1) false or unworthy of credence and, thus, merely a pretext for discrimination; or (2) true, but only a part of the motivation of which discriminatory animus was also a part. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

1.  **Prima Facie Case of Discrimination**

Graham satisfies her prima facie burden with respect to the first two factors. First, she is a member of a protected class as an African-American. Second, she was qualified for the position. Graham encounters trouble with the third and fourth factors.

Concerning evidence of an "adverse employment action," the termination of the contract would normally constitute such an action, but the Court reiterates Graham did not exhaust her administrative remedies concerning discrimination claims premised on this event. The Court, though, proceeds under the assumption the termination of the contract satisfies the "adverse employment action" requirement.

The potential "adverse employment actions" actually contained in Graham's EEOC complaint include alleged pay reductions, denial of pay, requirements she work at Bluebonnet's facility, and inspections of the sites where she provided services. There is evidence in the record to support these actions. The Court finds requirements Graham work in a particular location and the inspections of her work sites do not constitute "adverse employment actions," but pay reductions and denials of payment do because they fit into the category of "compensation." Therefore, Graham satisfies her burden with respect to evidence of an "adverse employment action."

Graham, though, fails to satisfy her burden on the fourth prong of the prima facie claim because she provides no evidence she was replaced by someone outside the protected class or was treated less favorably than other similarly situated persons outside the protected class. Throughout her pleadings, Graham suggests she was the only contractor to be subjected to certain unfair treatment. For example, in her Response, she writes: "[Bluebonnet] denied [Graham] the ability to work out her home [Bluebonnet] Violated [Graham] Civil Rights by denying [Graham's] Foster Care Application due to [Graham's] race; while approving other non-black Contractor's like Shelly Steed and BJ Mlasko Foster Care Application." Resp. to Def.'s Am. Mot. Summ. J. [#50], at 3. Graham provides no evidence to support any aspect of this specific allegation, just as she provides no evidence of the fourth prong of her prima face case for discrimination.

Therefore, the Court finds Graham has failed to satisfy her burden and establish a prima facie case of discrimination.

### 2. Bluebonnet's Legitimate, Non-Discriminatory Reasons for its Actions

Even assuming Graham had satisfied her prima facie burden, Bluebonnet has responded by satisfying its burden of articulating a legitimate, nondiscriminatory reason for its actions. There is ample evidence in the record indicating Graham was not complying with the terms of the contract and causing numerous issues for Bluebonnet. *See* Def.'s Am. Mot. Summ. J. [#46-1], Exs. 26–27. For instance, there is evidence of correspondence sent from Bluebonnet to Graham relating to issues like: (1) billing for services which were not supported by the service record or were unauthorized; (2) failing to provide trained backup staff in her absence; (3) having a constant flow of her subcontractors conducting business with her while she was supposed to be working with a challenging client; (4) failing to provide complete information regarding additional site at which respite services were being provided and an additional person who was on the lease for this additional site; (5) billing for services after authorization expired; and (6) repeatedly not turning notes in on time, turning in notes with errors, and failing to review subcontractor notes for accuracy despite training and notice relating to the contract requirements and deadlines. *See id.*, Exs. 4–12, 15–18, 20–21.

In short, Bluebonnet provides substantial evidence Graham was not complying with the terms of the contract and was doing a sub-standard job under the contract. This evidence explains, among other actions, why Bluebonnet terminated its contract with Graham, why Bluebonnet denied certain payments to Graham, why Bluebonnet paid Graham certain rates for certain work, why it required Graham to work at certain locations for certain clients, and why it conducted inspections of

Graham's unapproved work sites. Indeed, in its letter terminating the contract with Graham, Bluebonnet explains the reason for the termination was the continuous failure of Sharing the Love to meet the criteria for provision of services under the contract. *See id.*, Ex. 22.

Bluebonnet, therefore, has satisfied its burden of articulating legitimate, non-discriminatory reasons for its actions.

3.     **No Evidence of Pretext or Racial Motivation**

Since Bluebonnet satisfied its burden, Graham must offer sufficient evidence to raise a genuine issue of material fact as to whether the defendant's reasons are either: (1) false or unworthy of credence and, thus, merely a pretext for discrimination; or (2) true, but only a part of the motivation of which discriminatory animus was also a part. Graham provides no evidence on these points. There is no evidence these articulated reasons are false, and there is no evidence Bluebonnet's actions were motivated by racial or discriminatory animus in any way whatsoever.

In sum, there is no genuine issue of material fact on the merits of Graham's racial discrimination claim under the Title VII burden-shifting analysis, and for this alternative reason, Bluebonnet is entitled to judgment on Graham's discrimination claims under both 42 U.S.C. § 2000e and 42 U.S.C. § 1981.

## Conclusion

Accordingly,

IT IS ORDERED that Defendant's Motion for Summary Judgment [#38] is DISMISSED AS MOOT;

IT IS FURTHER ORDERED that Defendant's Amended Motion for Summary Judgment [#46] is GRANTED;

IT IS FURTHER ORDERED that Defendant's Motion to Strike Experts [#49] is DISMISSED AS MOOT;

IT IS FINALLY ORDERED that Defendant's Motion to Strike Exhibits [#51] is DISMISSED AS MOOT.

SIGNED this the 2nd day of April 2014.

_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE